The next case is Baker v. 3M Consolidated with Kiefer, Packer, and Estes v. 3M. Mr. Clement is here for the appellants, and Ms. Keller is here for the appellee. And once you're all ready, situated, Mr. Clement, you may begin your argument. Good morning, your honors, and may it please the court. Good morning. I'll endeavor to save three minutes for rebuttal. These consolidated appeals are the first arising out of the largest MDL in history. Early in the litigation, the MDL court granted plaintiffs summary judgment on the government contractor defense and adopted a flawed reading of the Noise Control Act that allowed plaintiffs to label the defendants as lawbreakers for following the military's explicit directions. Those legal rulings, compounded by procedural and evidentiary errors, have caused the MDL to balloon to the point where it includes 30% of the caseload of the entire federal judiciary. Those legal rulings are flawed and require reversal. On the government contractor defense, the MDL court erred at the threshold by holding that this case did not even implicate the uniquely federal interests that Boyle requires because it involved a purchase order rather than an elaborate procurement contract. That holding is plainly incompatible with Boyle and this court's decision in Brinson. In Boyle, the Supreme Court held that the entire process of procuring equipment for the military involved uniquely federal interests that could presumptively justify the application of federal law. For that reason, no court of which we are aware has demanded an elaborate contract to find uniquely federal interest presence. Instead, courts have routinely found this factor satisfied in situations like this court's decision in Brinson where the relevant practice was the continuing use of a part after there was a fix on the part and the military was aware of the fix and there's no indication in the Brinson opinion that that fix, which postdated the original contract, had any grounding in the contract itself and yet this court applied the government contractor defense. Similarly, this threshold factor was satisfied in Dorsey even though the case involved the purchase of asbestos. This threshold factor should not have detained the district court long and its rejection of the defense on that threshold factor indicates its begrudging approach to the government contractor defense. The district court's error was equally clear when it comes to the first factor of the three-part Boyle test that asked whether the government approved reasonably precise specifications when it comes to the relevant design aspects. Here, the government was the source of the relevant design features and it had the ultimate in precise specifications in the form of a prototype of the product itself. The only really written specifications that we see in the record in this case appeared in the 2006 medical procurement item description, which opened bidding for the earplug, and that's it in the record, right? As far as written specifications go, Your Honor, I mean, I'll grant you that, but I don't think written specifications are required, particularly when you have a situation where the government has a prototype of the item. All we have in the record are just emails from, what's his name, Mr. Olin, Doug Olin, who just simply said that the earplugs have to be short. Those are just emails. Those aren't specifications. Well, they are specifications about the design feature that matters, but I think the real thing in the specifications, I think the evidence, those emails from Olin are good evidence that the government was involved in the design. But as to the specifications, I think the key thing is the prototype, and Dr. Olin himself sort of drew this distinction when he told the procurement officials, quote, a non-linear earplug configured to the specifications of the enclosed product samples is what was authorized for purchase. So Dr. Olin himself— And that's reasonably precise? Absolutely, because he's got the actual product there, and the product there— I mean, the easiest illustration of this, Your Honor, is if my clients had then sent a bunch of earplugs that were longer than the prototype and didn't fit behind the helmet and didn't fit in the carrying case, those would have been inconsistent with the specifications. And the length of these earplugs here is not some sort of minor detail. I mean, it's the gravamen of the design defect that's alleged in this case. And so I think in these circumstances, the specifications are the prototype, and that is sufficient for the first factor I would submit. I think there should have been summary judgment for my clients on the first factor. But at a bare minimum, that should have been sufficient to preclude summary judgment for the plaintiffs on the first factor of the Boyle defense. And I think, you know, we obviously think that on the second factor, there's not even really a material dispute. The second factor essentially is— Well, the only concern on the part of the military, it seems to me, is they just wanted to make it clear that the double-sided earplugs have to fit within the soldier's helmets, and that's it. The rest of the design, the placement of the flanges, the exact length of the stem, the material that the plugs were made out of, all of that was left at 3M's discretion. With all due respect, I don't think that's the case, Your Honor. I think if you look at this— I mean, if 3M would have responded to the purchase orders with, like, a foam earplug, that would have been rejected. And that's why I think the prototype captures all of the relevant aspects of this. And, of course, that was the culmination of a process that started with the military consulting with sort of the French military and the Institute of St. Louis and Aero officials, and that's where they came up with the idea of combining the nonlinear earplug and the more traditional earplug in a single earplug. And if you get to the heart of this case, I mean, the two principal things that gave rise to the design defects here are the idea, first, to not issue two separate sets of earplugs. If they'd said—if they'd done the linear plugs and the nonlinear plugs separately, I don't think this issue would have arisen. And then the second thing is once they combine them, then the length does become a critical feature. And all of that's encapsulated in the prototypes. And so with all due respect, I think, you know, if there were a different number of flanges, if there were two linear ends instead of a nonlinear end and a linear end, all of that would have been inconsistent with the specifications and the prototype. And, again, Dr. Olin himself links those two together. All right. Now, on the failure to warn, it's clear that there were no warnings, just no instructions. That's what the military said, right? There was no—there were no warnings at all. There were no warnings. There were no instructions because Olin's instructions essentially to 3M and Arrow were to provide the 50 of these in a bulk box with nothing else inside the box. And the reasons that, you know, sort of ultimately justified that decision, I think probably had more to do with costs and a preference for the military to do the instruction themselves. And those—I mean, if you get back to Boyle and the heart of Boyle, it's related to the discretionary function exception under the Federal Towards Claims Act and this is a classic discretionary judgment by the government that we're going to save a little bit of money here by not having individual packages with labeling and instructions on them, and we're going to also—you know, we're going to do the instruction ourselves. And that's one of the things I think that's important to keep in mind contextually in this case. This is not a situation where— There's a difference between no instructions and no warnings, though. I don't think there's a material one here in terms of the government's, the military's directions to 3M, which is we don't want anything in the box. We don't want anything in the box with the 50-year plugs. And so warnings are out, instructions are out, and then when you get to the level of sort of, you know, a little bit later in the chronology, the government makes the decision that they do want to provide sort of a warning card or an instruction card, a little bit of both, I think it's fair to say, to individual members of the military. And again, there's a back and forth. Would you like 3M to provide that? Would you like 3M or Aero to provide the blister packs that they use in the relatively limited commercial sales? And no, there, too, the government makes the decision. They want their own instruction card. They formulate that themselves. All right. Now, on the failure to warn, why didn't 3M waive its unique federal interest arguments in Baker? You made it in the Estes, but you didn't make it in Baker, so it ought to be waived according to our case law, right? No, I don't think so, Your Honor. I mean, look, the reason we didn't make that argument as a separate sort of ground for our affirmative appeal is because the way we read the district court's opinion and the way we read it to this day is that the uniquely federal interest part was tethered to the judge's design defect ruling and not to the failure to warn. And so, you know, and particularly in a case where— So it was intentionally not raised in the brief? It was intentionally not raised by you? We don't read the district court's opinion as resting on that judgment. Now, the other side injected as an alternative ground to defend the judgment below that they read the opinion differently, and then we responded to that argument. I think that's sufficient to preserve it. I also think as a practical matter, one can take some notice of the fact that these were consolidated appeals, and we covered that issue to the fare thee well in the EHK briefing. I mean, it doesn't seem fair to Baker now. With respect, Your Honor, we think it's perfectly fair to Baker. I mean, Baker's represented by the same lawyer here today in the briefing. It's the same team in both cases. And, of course, I mean, again, there's the threshold issue, which is I still think we're right in reading the district court's opinion. She has a summary judgment opinion where she's addressing design defect and failure to warn all in one fell swoop. She talks about uniquely federal interest in the context of the design defect. It doesn't resurface when she gets to failure to warn. In failure to warn, her opinion rests, at least in my view as I stand here today still, on the ground that Dorsey limits in this circuit the failure to warn government contractor defense to those situations where the warnings are affirmatively precluded by the government. We think that's a vast overreading of Dorsey, and we also think even if that were the test, it's satisfied here. What does the evidence in the record show about what was told to Dr. Olin about the flange report? So what the record reflects on that is that he was told, essentially, he was not given the report, but he was given the gist of the report, which is that there was testing and that initially there were problems with variability, and then they addressed that variability and that problem by folding back the flanges. And then they retested it, and the product was good. So I think he was, and if you look at the flange report, the flange report is not the longest document in the world, and it really doesn't address much beyond what I've just said, which is, yes, they did two rounds of testing. They had variability on the first test. They addressed it with the fold. And, of course, you see that coming back into, obviously, we have evidence of exchanges of emails between Olin and Berger in the record, but you also see that even in the instruction card that the military had, they understood that the flange fold was a way to, and obviously there's back and forth about whether it's large canals, medium canals, very large canals, and all of that. But I think the gist of it was certainly there, and it certainly should have been enough to get this issue before the jury. And I think that's, you know, in a sense, to the extent there was going to be a back and forth that got into, and the jury could make a determination of whether Olin got sort of enough of the gist, all of that could have gone there, and the government contractor defense could have gone to the jury. But we lost that on the threshold on summary judgment. I'm going to give you a look. Go ahead. If I may, the government hasn't weighed in in this case, as I understand it, either on the government contractor defense or the Noise Control Act. Would it be helpful for the panel to seek the government's input? So, I mean, you know, obviously if the panel would find that helpful, you know, we would certainly, you know, have no objection to that or anything. We think that, you know, essentially both those issues are sufficiently clear, that there isn't a particular need to call for the government's views or ask the government's views. But if the court thought that was appropriate, certainly obviously we would have no objection to that. What do you have to say to their argument that a challenge to the regulations with regard to the Noise Control Act can only be brought in the District of Columbia Court of Appeals? So, I would say with all candor, Your Honor, I don't think that's their strongest argument. I think that is, you know, the idea that, you know, 19 years before this product had, you know, was created for the military, that that was when, you know, the one and only time that my clients could have brought a challenge in the D.C. Circuit. I mean, I think that argument is sort of kind of almost like factually, chronologically impossible, but more doctrinally the other problems with that is this is not an enforcement action for purposes of that jurisdictional argument, and second, and equally important, you know, this is not a situation where the regulation is interpreting the exemption. I mean, you know, in a sense, I think there's kind of a mismatch between the regulations and our statutory argument because what the regulations say is all products have to be labeled, whether they're noise-emitting or noise-reducing. And then the question that's a statutory question that I think is for this court and is not a regulatory question for the D.C. Circuit is, okay, but the regulation applies to products. The statutory definition of products exempts equipment designed for combat use. So you don't even get to the regulations until you decide the statutory question, and it's not a situation where the regs are directed to the scope of the exemption. Now, with regard to all these evidentiary issues, most of them, it seems to me, there was no contemporaneous objection to the admission of the evidence that you're challenging here on appeal. So we would apply a plain error review. And not only that, I mean, most of them, I mean, tell me why I'm wrong. It seems like if there was any error, it would be harmless. So, Your Honor, first of all, on the preservation issues, I mean, that's covered exhaustively in the briefs, but I just with all due respect disagree with the assumption that there were contemporaneous objections cited in the briefs to most of these evidentiary issues. To the extent they weren't, it's because there were motions in limine's rulings at the beginning before we went to trial, and the judge made clear she didn't want to hear any more about it. So we think we don't have a preservation problem on any of these issues. As to harmlessness, just two points, Your Honor. One, we've tried to, you know, we did not pick the three or four errors that we thought were the only errors that took place in these proceedings. We picked the ones that we thought were most impactful that the other side went to time and time again. And to just pick one, the Viotis letter, where, you know, there's this hearsay statement that's, in fact, factually wrong about the products being defective. My friends on the other side went to that letter time and time again with multiple witnesses. They went to it in closing as the trap that was there. What letter was that? I'm sorry? Which letter are you referring to? Viotis. Okay. From the Air Force. Okay. So I don't want to overindulge my time, but I appreciate the Court's attention. All right. Thank you, Mr. Clement. We'll hear from Mr. Keller. Good morning, Your Honors, and may it please the Court. Ashley Keller for the Veterans, who I'm pleased to report, many of whom are here today. As this Court has said many times, the government contractor defense comes down to the government made me do it. 3M has no summary judgment evidence showing that the government made it breach any of its state law duties, which makes the Estes, Hacker, and Kiefer appeals simple on this issue, because each claim the jury found for them on independently supports the judgment. Let's talk about fraudulent concealment, which my friend from the other side didn't mention at all. There's, of course, no summary judgment evidence in this record where the government made 3M defraud the government, and I would dare say there's never going to be summary judgment evidence in any record, in any case, where the government insists that a government contractor defraud the government. So that can be the beginning and the end of the government contractor defense with respect to those three veterans. If we would like to move on to design defect, 3M has a little bit more, but it's still woefully insufficient under Rule 56, and I want to take the argument that my friend on the other side just brought up, that they showed Doug Olin a prototype, so that's somehow enough to establish the government contractor defense. Justice Scalia's opinion in Boyle expressly rejects that rationale. You can look at the air conditioning example where he says, if the government tells a contractor we want an air conditioning with a certain amount of cooling capacity, but they don't say how to make that air conditioning, make that cooling capacity, it's still the manufacturer's responsibility to comply with state law. There's no displacement, to quote Justice Scalia. He says the exact same thing with the Sikorsky helicopter example. He says if the government just purchased this in stock, they may have known when they looked at it that there was a hatch that opened out instead of in, but that's not enough to preempt state law. But this is, it seems to me, this is much simpler than an air conditioning design or a helicopter. Here we're talking about the length of the earplug, and I believe that's Mr. Clement's argument. Yeah, so it is true that there are some aspects of this product that are simpler than a helicopter, but a hatch that opens out instead of in is not that complicated. And Justice Scalia says if the government still didn't consider that particular design feature, that's not enough to displace state law. But even with respect to Your Honor's question, which I think goes to the email from Doug Olin where he says, my green suited friends want the product to be shorter. He doesn't say how to make it shorter. He doesn't say to shorten the stem. It was 3M that made the decision to shorten the stem. And there was testimony in the record in both trials that they could have shortened the tip. So it was 3M's discretionary judgment call to shorten the stem. And the veterans proved other design defects to the jury that are not mentioned anywhere in Doug Olin's email. The stem was too thick. It was too rigid. The flanges were too large and in the wrong place. They have absolutely nothing talking about those design defects, each of which independently supports the jury's verdict. And again, no one's challenging substantial evidence. Well, this certainly doesn't end the inquiry. But the district court seemed to say when you read her order, she seemed to say that you need a contract with specifications. And the unique federal interest in Boyle didn't involve a contract. It's just merely the procurement of equipment by the United States? Yeah. It seems like she heard. That doesn't end the inquiry. But I don't understand that conclusion. Because the procurement of equipment by the United States is intrinsically a uniquely federal interest, isn't it? Yeah, forgive me for interrupting you, Your Honor. I will concede that it's easier to defend the district court's judgment on the second independent ground, which is that there were no reasonably precise specifications that the government approved. I am going to defend the district court on the first ground, though. I do think she was right. Boyle does say that preemption occurs when a contractor has to comply with its procurement obligations of government contracts. Now, it's true that this court in Brinson and other courts in cases like Agent Orange say it doesn't have to necessarily be a written contract term. The course of dealings between the parties can establish the obligations of government contractors. But I do think there has to be a contract that sort of specifies where there's displacement of state law. But, again, I'm not going to fight with Your Honor that the second ground that the district court proffered for granting summary judgment is the better ground. And it fits exactly with what my friend for the other side said, which is this is about discretionary decisions of government actors. Justice Scalia's opinion in Boyle roots the common law government contract defense in discretion under the FTCA. And that's why this court and others have said there's a big difference between a rubber stamp and approval of reasonably precise specifications. When you have reasonably precise specifications over the particular design defects that are alleged under state law, we don't want court second guessing when the military says, I need to make a tradeoff between effectiveness on the one hand and safety on the other. There was no tradeoff here. Doug Olin didn't consider anything associated with a shorter stem. He didn't even know that they were going to shorten the stem instead of the tips until after the fact. 3M didn't know that there was a tradeoff at the time that they first put these products in the veterans ears. They conducted testing. This is undisputed on the record. After they were already selling the earplug to the military, they did the flange report and realized there were huge problems after the fact. You heard my friend on the other side concede they never turned over the flange report. And what did the military do when they found out about all the things that 3M had been concealing for the better part of two decades? They immediately intervened in a key TAM suit, sued 3M for fraud, never withdrew the fraud allegations, and then settled the case not for nuisance value, as 3M likes to pretend, but for 100 percent of the profits that 3M ever made from selling these earplugs to the military. So I think the government contractor defense, particularly for Estes, Hacker, and Kiefer, is exceedingly weak when every independent claim that the jury found in their favor on supports the judgment. Now, I do have to address failure to warn. Before you get to that, let me ask you another question about the district court's threshold inquiry about the procurement contract. It seems to me that duplicates part of the Boyle test itself, whether they're reasonably specific specifications. How do you defend the district court's framing the issue in that way? I wouldn't call it duplicative, but it's definitely overlapping. And I actually think all of the Boyle factors can be read to overlap with each other. The reasonably precise specifications prong, for example, certainly turns in part on knowledge that the military has so that it can exercise its discretion, which you could say is also the third factor. This isn't the words of a statute, right? This is not Congress dictating that there's going to be preemption of state law. This is the Supreme Court announcing a common law rule that's an amalgamation of different principles, most notably the discretionary function of government actors under the FTCA. So I don't think that we need to have this rigid compartmentalization between the three factors. But I would agree with Your Honor that the factor that the district court focused on first does seem to bleed into the factor that it considered second. But that's not an error that requires reversal, certainly on a claim like fraudulent concealment, where, again, I think there's no dispute on the summary judgment record that the government didn't make 3M do it. If the district court misstated the test, if we believe that was the case, could we still affirm the district court's conclusion on the government contractor defense? Of course you can, Your Honor. You can affirm or reverse the judgment on any ground that the law allows. You could say, even though I don't disagree with this proposition, that the district court erred in saying that there was no uniquely federal interest. But it got right based on the summary judgment record that there were no reasonably precise specifications that the military ever approved. That's completely in the record before you. You have the district court's reasoning. You have the facts presented by the parties. So you could easily affirm on that basis, even if contrary to my position, you don't agree with the district court that a contract term is required to establish a uniquely federal interest. What do you have to say with the position of counsel that you're not prejudiced by 3M's waiver of its unique federal interest argument in Baker? First, I don't think that we have to establish prejudice for waiver. And this notion that because counsel to Mr. Baker is the same as counsel for Estes, Hacker, and Kiefer, I just respectfully would disagree with that proposition. Mr. Baker has his own judgment. He's entitled to defend that judgment on the appropriate grounds that the law allows. And so to say, because his lawyers are the same, he chose to have the same counsel represent him in a consolidated appeal, that means he's not prejudiced. I just don't think that passes the straight face test. He has his own independent right to have this judgment rise or fall based on the record and arguments that were joined by the parties. And to me, it's just crystal clear that they didn't join issue with Mr. Baker on that question. And so, you know, the fact that they want to mash all the briefs together and treat this as one big MDL, the Supreme Court has instructed in Gelboim, just because cases are consolidated for pretrial purposes in an MDL doesn't mean that they lose their separate identities and character. Each veteran here has their own unique action that rises or falls based on the record and their particular trials and the briefing that the parties have engaged in before your honor. So I respectfully disagree with my friend on the other side on that issue. I have a question concerning noise emitting products. So assuming the equipment isn't limited to noise emitting products, do you otherwise dispute that the CAEV2 is designed for combat use? Yeah. So I think if I take the premise of your question, I'm going to ignore jurisdiction, even though I would normally address it first. I understand that you want to talk about the merits. And if you disagree with me on the interpretation of the word equipment, both de novo and under a deferential standard that we think the EPA is entitled to under Chevron. If all of those things are true, I would agree that the combat use exception applies. I would not be forfeiting my plain excuse me, harmless error argument. This is most relevant to Mr. Baker because, again, Estes, Hacker and Kiefer don't need the failure to warn claim to support their judgment. So with respect to Mr. Baker, we make harmless error arguments. I would highlight two of them here. The jury obviously came back only on strict liability failure to warn. That's a pretty strong indication that these regulations weren't relevant when they were considering the standard of care, which was much more pertinent to the negligent failure to warn claim. And I would also note that 3M certified to the government that it was complying with these testing protocols. You can see this in the April 16th, 2021 transcript at 218. Obviously, a false certification of the government is separately a violation of law. So that could have independently supported the negligence per se or negligence that you can take into account under Washington law for violating these noise control act regulations. So I think the harmless error arguments would carry the day. Accepting the premise of your honor's question, which, of course, I have to say I don't accept and I'm happy to go into any of the jurisdictional or other issues. Maybe sticking with that since we're talking about the noise control act. You heard my friend on the other side say that this isn't our strongest argument. I think he uses the word frivolous a couple of times in his brief. And he said to you what he says in his brief, that this isn't an action for enforcement, which is quoting the text of 49 15, the jurisdiction stripping text. You'll notice that on page 19 of his reply after saying that he doesn't cite anything. He doesn't cite the statute. He doesn't cite the regulations. He doesn't cite a case. And the reason he doesn't cite anything is because he's dead wrong on this point. Let's start with the text of the noise control act. Section 49 11 a creates a private right of action that allows plaintiffs like the veterans to enforce the regulations. 49 11 even says nothing in this statute shall stop those plaintiffs from pursuing a statutory or common law claim for enforcement. So the statutory text tells you that this private versus private action is an enforcement action. And so does Supreme Court precedent, admittedly not in the noise control act context. But I don't think that's particularly relevant for purposes of the principle that guides us here. So in the PDR case, the majority opinion twice refers to a private versus private private plaintiff versus private defendant action to enforce the telephone regulations as an enforcement action. Justice Kavanaugh's concurring opinion refers to it as an enforcement action about a dozen times. So we've got text and Supreme Court precedent on our side. And my friend just has the argument that this is frivolous. So I think that the jurisdiction strip is appropriate here. And even if you didn't agree because of the fairness principle that you heard my friend say, it's not fair that we had to challenge this regulation within 90 days. Because the CAEV2 wasn't even invented yet after 90 days. That would be severable from the fact that this has to go to the D.C. Circuit. Well, let me let me ask you at the time that you have left about the post acceptance evidence. 3M relies on Judge Anderson's decision and Brinson to say that the military could have made a discretionary decision about how to address the problem. A decision that we we do not want to second guess through a state law tort suit. Why isn't it a question of fact whether the military made a discretionary decision to continue with the earplug design features after becoming aware of the defects? Yeah. So as an abstract summary judgment would be improper under those circumstances, wouldn't it? Yeah. Forgive me for interrupting you, Your Honor. As an abstract matter, I agree it's a question of fact whether the military exercised its discretion. But under normal Rule 56 Celotex principles, the question is whether there was a triable issue of fact on this record. There's no evidence that the military was made aware of the design defects. There's no evidence that the military received proper warnings. You heard with respect to the failure to warn claim under doors and cases like Glasgow Belt that the military wasn't told about this. But that's OK, because they told us not to put anything in the box. The jury instructions for Mr. Baker were crystal clear. He could meet his burden of proof to establish a failure to warn claim by showing that they didn't warn the government. And therefore, the government couldn't train them properly with the warning. So this notion that putting the warnings on the box, which undisputedly they could have done, or providing the flange report, or providing Owen with an email with a detailed suite of warnings that that wouldn't have done any good, is belied by the jury instructions that nobody challenges were legally sufficient. So I agree with Your Honor in a hypothetical, plain vanilla case, this could be the sort of issue that goes to a jury. But they utterly failed with their burden of proof. All right. We have your argument, Mr. Keller. Thank you. Thank you, Your Honors. Mr. Clement, you've reserved some time for rebuttal. Thank you, Your Honors. Just a few quick points in rebuttal. First, with my friend's argument that the fraudulent concealment claim or the fraud claim somehow renders the government contractor defense irrelevant in the EHK cases, with all due respect, I mean, one of the things that they were allowed to argue to the jury because the MDL court took the government contracting defense away from the jury at the summary judgment phase, was that it was fraud to give this product that was fundamentally defective to the government. That was the heart of the fraud. And so maybe it's theoretically possible that if the MDL court had gotten the government contractor defense right or allowed us to go to the jury on that issue, there might be some kind of fraud claim that survived the government contractor defense. But they were never put to that test because the government contractor defense was wiped off the table at the beginning. And so one of the kind of frauds that they could prove is that we fraudulently gave the military a defective product or we fraudulently gave them products without the requisite warnings. The second point I wanted to make is just to go to the Boyle opinion. My friend would like you to focus on a couple of examples in the Boyle opinion. I would love this court to take another look at the Boyle opinion. I think the Boyle opinion is exceptionally helpful to us. I think with respect to, we're not talking about things that the government wasn't involved in. I do think there were specifications here. I think it's very telling that Dr. Olin linked the prototype to the specifications. Again, I read it, I said it before, but I think it's worth repeating. He said a non-linear earplug configured to the specifications of the enclosed production samples. That wasn't just their length, that was all of the requisite features that the military had been working with Arrow for years to develop into a two-sided plug that would work for them. But the one thing to keep in mind about the Boyle opinion and the one thing that you would notice on rereading is one of the things, sad to say, that the Boyle court did was overrule this court's Shaw opinion. And I don't think this court, my friend, in some respects is kind of luring you into repeating the error in Shaw. In Shaw, this court said, well, it's really got to be the government that was the origin of everything in the problematic design. And the Supreme Court was emphatic in rejecting that position. So just two finishing points on the Noise Control Act. First of all, as to the idea that this could be harmless error in the context of these cases, with all due respect to my friend, I think that's fanciful. The Noise Control Act ruling allowed the plaintiffs in this case to label the defendants lawbreakers, and they took advantage of that opportunity from start to finish. It features in the closing argument, and that is far, far from the harmless error. And lastly, a rather minor technical point, but we did provide a citation for a not-enforcement action. It's the errors decision in the Baker reply brief. Thank you, Your Honors, for your attention. All right. Thank you, Counsel.